Good morning, Your Honors. I think it would be helpful to start with a little examination of the relationship between SCAF on the one hand and Kwan and his investment advisories on the other. His investment advisories are SIA and ACORN. This relationship, I believe, informs all of the parties' arguments here, and actually the jury's verdict below in the Kwan case, specifically on the aid and abetting claim. This court in SEC v. Kwan actually recognized the distinction between Kwan and SIA and ACORN on the one hand as active participants in the fraud versus SCAF on the other hand, which is entirely passive. This court actually explained that the evidence presented by the SEC there showed that SCAF was an entity that, quote, didn't do anything active, was just a big pool of money that sits there, and did nothing for itself, and was little more than a piece of paper. And that, Your Honors, I believe, actually comports with a couple things here. One, the governing fund documents, and two, industry practice in the investment management industry. First, with respect to the governing fund documents, it states in the PPM that's submitted to all the various investors that all investment decisions are made by Kwan, solely through SIA, to SCAF. That makes total sense, Your Honor. This is an investment advisory entity. The SEC sued Kwan and SIA and ACORN out of the box. Why? Because they're the actual active decision makers here. SCAF is just this passive vehicle. What is SCAF? SCAF is actually just a vehicle that is owned by the actual investors. They purchase membership interest in SCAF. Every investment decision, conversely, is made by Kwan, is made by SIA, is made by ACORN here. And in addition to the governing fund documents, you also have ACORN's role, which obligated ACORN to perform due diligence services and risk management services on behalf of SCAF. That's the threshold issue that was before the trial court. Who's doing what for the investors? Who's providing due diligence? Who's providing risk management services? Your Honor, so respectfully submit, that's not SCAF. That actually is the bad actors. That's SIA through Kwan. That's what the SEC recognized when they first actually brought their action. Now they didn't actually tellingly amend their complaint for over a year later. It doesn't really make sense because ultimately, when you really think about it, when SCAF is a passive entity, what does that mean? That they somehow participated in a fraudulent scheme to defraud themselves? No. Again, all investment decisions are made by Kwan on behalf of SCAF. That's even when you go to industry practice. There's a reason why investment advisors owe fiduciary duties to the fund. It's precisely that. There's a reason why they have separate vehicles. It's because the investment advisor is making all active decisions on behalf of the actual fund. The fund doesn't do anything active. As this court specifically recognized, it's just a vehicle. What happens with the investment manager in industry, if there's a notion that somehow the fund itself, separate and apart from its investment advisor, is making affirmative representations, is performing due diligence services, it just doesn't comport with industry practice. When you think about it, you have the governing fund documents, which specifically lay out that obviously all investment decisions are made by its investment advisor, Kwan. Certainly the court below, the jury recognized this, that they were the active participants in the fraud. It's Kwan. It's SIA. It's actually ACORN because they're the ones that actually have to perform the services at issue. Was Kwan an agent of SCAF then? Your Honor, I think as far as the agent issue is concerned, I would submit that actually it's in reverse. I think it's that SCAF in a way was an agent of Kwan. Again, from the standpoint of SCAF not taking any affirmative role, I know the SEC was trying to argue this. Frankly, I didn't follow this because again . . . I don't follow how SCAF would be an agent of Kwan. You mean SCAF could act without Kwan? No. That's precisely the opposite. SCAF could not do anything outside of Kwan. That's what actually the governing fund documents actually state. If Kwan is an agent of SCAF, then couldn't SCAF be liable based on what Kwan does? Your Honor, I believe this court in the SEC Kwan decision where Kwan actually appealed the inconsistency of the verdicts, he put forth that precise argument and the court rejected it because he was saying that just because that Kwan and his investment advisories were filed liable, that it should follow naturally that SCAF would be liable as well. This court actually recognized that distinction. I believe that I was alluded to earlier. The court said it doesn't necessarily follow, but that doesn't preclude that it could follow in a separate proceeding that . . . It could, Your Honor, and that's . . . Some risk. Hansen may have seen some risk. Your Honor, that's an interesting question because again, the SEC put this issue in play. They obviously brought the aiding and abetting claim against . . . which involves obviously a finding, a 10b or 10b-5 finding against SCAF. The jury instruction number 23 specifically speaks to that. Even though SCAF is not on trial, you, jury, must make this specific finding whether SCAF itself violated 10b or 10b-5. Now again, with respect to the entire practice in the logic of those arguments, it is just very difficult to see because again, as this court recognized, when you don't have . . . when you have a fund that is, again, doesn't do anything active, which every fund in the hedge fund marketplace actually does, you're wholly reliant upon your investment advisor. That's the point. Who's the person that's driving the bus? It's Quan. There's no doubt about that. That's what the investors are relying upon. So when you start to think about it and really break down the arguments, they're saying that SCAF made affirmative misrepresentations. On what basis? They actually tried to discuss the fact that there are documents on SCAF's letterhead. Well, yes, of course there's documents on SCAF's letterhead. It's the fund. It's an LLC. Yes, it's an LLC. But the LLC doesn't do anything affirmative like every fund in the marketplace. It's when you . . . They have to act through the principles, right? You act . . . exactly. Who's the investment advisor? So every investment advisor out there has their track record and you follow the best investment advisors. This was, in this case, Quan. People were following Quan's lead. But the notion, again, that then when you're looking at the investment advisor on one hand, and again, under the governing fund documents, everybody understands exactly how the fund worked. It was all investment decisions were made solely by Quan. Again, the second layer. So you have SIA, which is Quan's advisory entity, and then you have ACORN. And ACORN was basically the servicer of the loans at issue. What did they do? Well, ACORN said, we're going to provide the due diligence on the loans. We're going to actually provide risk management services on behalf of SCAF. That's the point. All investment decisions were made on behalf of SCAF and all risk management services were made on behalf of SCAF. So now let's backtrack and think about what the SEC is actually alleging here. The fact is, is that you have a passive entity that somehow is making affirmative representations to its own investors. It's illogical. It's illogical under industry practice. It's illogical under the governing fund documents. And frankly, it's illogical as this court itself has recognized. Mr. Shepard, what is the holding you're seeking from this court and what relief specifically do you think we can provide to you? Yes, Your Honor. What we are submitting, again, is that it's the second part of the argument, is that certainly the preferreds and the Class A investors are not similarly situated. We want to uphold the governing fund documents because, again, as the receiver agreed in the first stipulation with the SEC, it was, we are going to be beholden to the jury's verdict. There was one count that involved SCAF. That was the aid and abetting claim, which the jury was specifically tasked to actually make a finding whether SCAF violated 10b and 10b-5. But only 10b. 10b and 10b-5. But only those two. Correct. But, Your Honors, as the SEC has conceded, there's no separate evidence that they're going to put forth vis-a-vis SCAF. What other second bite of the apple do they need here? It's a passive vehicle that they obviously put the issue in play. The aid and abetting claim was in play. They didn't have to bring the aid and abetting claim. It was the only actual count involving SCAF. It's the only count where the jury came back of not guilty. I'm sorry. I interrupted your answer to Chief Judge Smith's question. Sure. What we would like, Your Honor, is to adhere to the jury verdict and, frankly, make a distribution according to the governing fund documents, which the receiver agreed to do, if and be informed by the actual jury verdict. He, conversely, swept it under the rug and, despite this light court's actual language and understanding of the role of SCAF, just stipulated to a judgment. He went against his word, Your Honor. This is a situation that, ultimately, again, from an investment management perspective, this overturns the entire industry. Why? The preferred signed up for a liquidation preference, which specifically addresses this issue. When the fund fails, we come out first. But when the fund fails by fraud? I think it's any business risk, Your Honor, to be honest, because when you come in and you know that in the capital stack, you come out first. Now, there's a couple of other differences. The preferreds also had a guaranteed rate of return. But everybody was in, were victims in this Ponzi scheme. They're all, all the money's clangled. Your Honor, this is actually true. This is a great point. It's actually not a Ponzi scheme. The SEC even concedes that, frankly, basically, 60% of the assets, of stewardship's assets were put into Pedders. Right? 40% were put in other vehicles. Some of that, the monies that are before, that are before the court are, relate specifically to those other investments. This was not a Ponzi scheme. This was a situation. So . . . But most of the money was put in the Pedders. 60%, I believe, Your Honor. So 40% was not. And ultimately, it's a situation here where we have a liquidation preference and a guaranteed rate of return. Those contractual preferences, neither one of them were actually honored. Neither one. How is that equitable? When the actual, when the receiver agreed to abide by the jury verdict, and there's no active role played by SCAF, and the SEC presented all its evidence, and the jury came back . . . Superintendent, do you wish to keep any time? Yes. I'll keep, I'll reserve two minutes here. Thank you, Your Honor. Mr. Hanson? Thank you, Your Honor. I'm Gary Hanson, receiver and the attorney for the receiver, so you may have a fool in front of you, a client for myself. Let me talk quickly about the plan itself. This is an equitable receivership. In equitable receivership, it's clear that Judge Montgomery did not need to strictly apply the underlying documents, and in fact, the distinction that counsel wants to make here is that he had a slightly different promise his clients did than somebody else in that they had a priority of payment, but that was an illusory promise. That promise was not real, any more than the promises made to the Class A shareholders were real, because underlying all of this at the center of it, at the core of the apple, was fraud, a promise that there was going to be a lockbox that money would go into, a promise that there were going to be audits of the peddler's entity, a promise that there was going to be credit insurance, a promise that there was going to be an actual check to see if there was underlying equipment, and there was not the peddler's transactions. That's the core of this. The core of this is fraud. And when you have fraud, Judge Montgomery had the responsibility to make an equitable assessment of what ought to happen with the limited proceeds that we had. In making that decision, she had the right and the obligation to recognize that the preferreds had already been paid out roughly 50% of their investment. That happened just a couple months before the collapse of the peddler's fraud, and it happened at a time when payments had stopped coming in from peddlers, and it happened at a time when Mr. Kwan was discouraging the Class A shareholders from getting payouts. They got a preference. They got a 50% preference. I could have started clawback actions. I could have clawed money back. I could have recommended a rising tide payback where they didn't get any more money until everybody had 50%, which never would have happened. The judge had all of these factors in front of her. She had to make an equitable decision. She made that. It's before you on abuse of discretion. I don't think you can find abuse of discretion. The judge also made a decision as part of the equitable plan about the payment of the cost of defending this appeal if it's not successful. That was not objected to at the trial court level by appellants. Judge Montgomery, I think it's page 767 or 76 of the appendix before you, specifically asked counsel an oral argument, what his position was with respect to that. And he never responded, and he never objected. The issue's not before you, but if it were, it's not analyzed as a fee-shifting traditional penalty for bad behavior by a party. It's just part of the equity here that when the class A's are already getting only 13%, they shouldn't have to pay for the cost of this appeal. Let me turn to a third issue, and the word collateral estoppel wasn't used, I noticed, in the argument here today. But that's essentially what the court's being asked to find, that the decision in the first trial that Marlon Kwan did not aid in the Betz-Skaff and his securities violation is collateral estoppel with respect to the claim against Skaff that it committed a securities violation. Well, I don't know if he's arguing collateral estoppel. He's arguing that the stipulation was unreasonable. Well, let's leave collateral estoppel aside and let's talk about reasonableness for a second. Because there are really two stipulations. Do you think he's arguing collateral estoppel in the- Absolutely, absolutely. And he certainly argued that below. I think he's saying that that issue has already been decided because Marlon Kwan was found not to have aided in a Betz-Skaff, that the Skaff could not have committed the securities fraud. All right, well, go ahead and address it then if you think that's the argument. I just didn't want you to knock down a straw man. Yeah, well, and that's fine because I can turn to the other part of this, which is there were actually two stipulations. I stand in the shoes of Skaff. Before that first trial, I could have stipulated to the entry of judgment against Skaff. I could have assessed the situation. I could have said, I don't want to spend receivership assets defending this trial, which I think is inevitably going to be a loss. I took a more conservative route. I said, is there a way I can stand on the sidelines, see what happens at that trial, and then make an assessment as to how to proceed in the light of what happens at that trial? I think that's a more cautious, conservative route to have taken. I did not say anything other than after that trial was over, I would be guided by the results and make further decisions with respect to what I would recommend to the court. Why do you say it was reasonable in light of the verdict to stipulate to liability? The same reason I think this court has already said in the first case, and I come back to whether we're calling it collateral estoppel or something else. This court didn't say that Skaff was nothing more than a piece of paper in its prior decision here. It said as far as the jury would know in that first case, Skaff may have been nothing more than a little piece of paper. Because in that first case, the evidence was not concentrated on Skaff. The court found, and Judge Montgomery found coming up in this case, that there was no real reason for the court to have focused on that issue and what Skaff's involvement was. What I know is that the SEC's allegations were that the offering papers from Skaff, the offering documents, made these very representations I've talked to you about today. And I know that in the first trial, those misrepresentations are what the jury had before, when it found that the other parties had committed securities fraud. So in those circumstances, it was very reasonable to assume we'd come to the same result if I had pushed forward to trial. And in fact, we know, because Judge Montgomery has addressed this very issue of the impact of the first trial on the stipulation and the plan. We know she would have ruled against me if I'd asserted the arguments that counsel is asserting here today. So what I would have had to do was go to trial, a trial that I thought was inevitably going to be lost. I would lose it, I would lose whether we're calling it collateral estoppel or whatever term we're using. I would use that argument that the decision has already been made that Skaff cannot be liable for security fraud. I would have had to appeal to this court and see what this court says on those issues. And in all of that, to favor three investors, because that's all we're talking about, three investors here who had already been paid out 50% of their investment with other people's money. I think also, if I understand part of the argument is that Skaff couldn't even be liable. So independent of the jury's verdict in the Kwan case, that it's this pass through entity that in- I couldn't disagree with that more. The offering documents are Skaff letterhead and Skaff representations made through their agents. Of course, they'd have to be made through their officers and agents. That is the evidence that would have gone before the jury in the second case. And there's no possibility that they could not have been found guilty or liable. Unless there's questions, I see I've got about ten seconds left here, so I'll sit down. Thank you, Mr. Shepherd. Mr. Lotion for the SEC. Good morning, your honors. And I'll just say a word from the SEC's perspective, and I'll address this question of Skaff's liability and its status. We don't think there's any merit to this notion that Skaff somehow can't be liable. This is a misrepresentation case, and the misrepresentations were made in Skaff's offering documents. Those were clearly attributable to Skaff, and so we think Skaff is clearly liable for the misrepresentations that occur in the documents, in its own offering documents. And to the extent the decisions were made by Kwan that are relevant here. I think I heard appellant's counsel say that decisions were made by Kwan on behalf of Skaff. That is an admission that Kwan was an agent of Skaff. And we think under ordinary principles of agency and corporate liability, the decisions and the actions of the agents are attributable to the corporation. Remember that Skaff is an LLC, it's a corporate entity, and it's just basic corporate law that Skaff would be liable. The other thing I'd mention on this is that the reason the commission amended its complaint to add Skaff as a defendant when it did, was because the Supreme Court, shortly before, had issued its decision in the Janus case, which we cite in our brief. And Janus really confirms that Skaff is liable here, because Janus, like this case, involved a fund and an investment advisor, an investment advisor that had a close relationship with the fund. And there, the case was against the investment advisor. And the court said, in a misrepresentation case, that the investment advisor couldn't be held liable for misrepresentations that were made in the fund's prospectus. And that the liability there was really the fund's liability under 10b-5b, which prohibits making misrepresentations. It was really, in the court's view in Janus, the fund that made the misrepresentations and therefore faced the liability. And so if you apply that here, it's very clear under Janus that Skaff certainly bears liability for misrepresentations in its own offering documents. The other thing I'd mention is that it's important to take a step back and understand what this would look like if the appellants. What the appellants are really trying to argue here is that we should have a trial. We should re-litigate the question of whether there was fraud here. And resources should be expended on investors behalf, all to determine whether Skaff, this hedge fund entity, committed fraud. But we've already had one trial. The trial, Skaff wasn't a party at the trial. Kwan was a party, but that trial showed that misrepresentations were made, that the statements in the offering documents were false, that they were material, and that they were made with scienter and all the other elements of fraud here. It's just really this kind of technical question of Skaff's liability that we don't think is a difficult question to begin with. That wasn't resolved by that first trial. And I think it would be absurd to have another full trial to resolve that one question, expend all of these resources, when we all know we have 59 investors here who were defrauded by Kwan and by Skaff. And on that point, I'll just say one other thing about the investors. We think Judge Montgomery made a reasonable decision here to approve the distribution plan with a pro-rata distribution to all 59 investors who were defrauded here. And we think it would not be fair for the bulk of that money to go to just three investors, the appellants here. Particularly given that those three investors pulled out 50% of their investment before the fraud was discovered and the fund unwound. And so they've already recovered 50% where most of the other investors have recovered nothing so far. What were the circumstances under which they made that decision to withdraw 50% early? There was some reference to trying to head off the class A investors. Was there anything untoward about that process? I wouldn't allege that there was anything untoward about it. I don't know precisely what they knew and precisely why they decided to withdraw when they did. So we're not alleging that it was improper for them to withdraw. It may just have been good luck on their part, but it's good luck that the other class A investors didn't have. We do know that other class A investors had trouble withdrawing. Their efforts to withdraw were thwarted by Kwan, or he delayed them. So- At about the same time? I'm sorry? Was it at about the same time? At about the same time, I believe. Yes, that's right. So we think that's a strong equitable reason here to favor a pro rata distribution, as Judge Montgomery did. I'm happy to answer any other questions, but if there aren't any, we'd ask the court to affirm. Thank you. Thank you, Mr. Lotion. The court thanks all counsel for your presence in the argument. You've supplied the court in the briefing. Oh, I'm sorry. Man, here I am going too fast. Mr. Lotion, you do have rebuttal. Thank you. I appreciate that. And you have your full time. So, let me just address a couple things quickly. First, with respect to these redemptions. Everybody had a right to redeem. This is an automatic right for any investor. They talk about the preferred recovery of 50%. The redemption matrix is never placed into recovery. In fact, a number of the A investors also redeemed. They also redeemed, and some of whom, even as the SEC admits, actually also redeemed over 50% of their investment. The notion is, let's think about fairness. Here, if our liquidation preference is honored, we get 100%. If we don't, we go down to 13%, like with everybody else. If our liquidation preference is honored, that class A investors, their recovery is only reduced by 5%. Where's the actual fairness in that? With respect to the fee issue, Your Honor, obviously, we think it runs afoul of FUQA. In addition, there is no actual authority, etc., cited by Judge Montgomery. In addition to that, just from an inherent fairness standpoint, there's only one group of investors that was actually going to appeal this. It was the class P investors. And we certainly have a good faith basis to bring an appeal, as with any sort of investor. So the notion that we have to actually foot the receiver's fees for exercising our ordinary appellate rights just seems highly inexcusable. Did the district court, was this argued before the district court? It was raised at the end of oral argument, in addition by the receiver. And it was raised, I didn't have time to reply. And that was raised for the first time, not in papers. And the last thing, Your Honor, I'll just end with offering documents. Who are the offering documents actually prepared for? Prepared by, actually, SIA and Quan, not the investors. That's not the situation here. They don't prepare their own documents. Thank you, Your Honor. I see my time's up. Thank you, Mr. Lotion. Apologize for appearing to cut off your argument time. Again, thank you, all counsel, for your presence this morning and the argument you've supplied the court. We take your case under advisement. You may be excused.